REINHARDT *v.* LANGE.

1. SPECIFIC PERFORMANCE—CONTRACT AS TO FARM—EVIDENCE.
    Record in suit for specific performance of mother's contract to
    leave farm to son who stayed and worked it on shares after
    death of father *held,* not to justify insinuation in appellants'
    brief that the 9 witnesses for plaintiff who were friends and
    neighbors were motivated by any other desire than to tell the
    truth as they testified.

2. SAME—CONTRACT AS TO FARM—PERFORMANCE—EVIDENCE.
    Evidence presented in son's suit for specific performance of
    late mother's contract to leave farm to him if he would
    stay on the farm after his father's death and work it on
    shares for the balance of her life *held,* to sustain trial court's
    finding that such a contract existed and that it was fulfilled
    by plaintiff.

Appeal from Berrien; Hadsell (Philip A.), J.
Submitted October 8, 1959. (Docket No. 41, Calendar No. 47,851.) Decided November 24, 1959.

Bill by George Reinhardt against Ronald H. Lange administrator with will annexed of estate of Otillie Reinhardt, deceased, Gladys Reinhardt Clark and Albert Reinhardt, Jr., for specific performance of oral agreement to devise property. Decree for plaintiff. Defendants appeal. Affirmed.

*Joseph E. Killian,* for plaintiff.

*Seymour & Seymour* and *Ronald H. Lange,* for defendants.

REFERENCES FOR POINTS IN HEADNOTES
[2]  57 Am Jur, Wills § 185 *et seq.*

KELLY, J. Plaintiff's action for specific performance is based upon an alleged oral agreement with his mother that, if he would remain with her on the farm until her death, the farm would be his.

Plaintiff's mother was 82 years old at the time of her death (September 19, 1956) and lived, owned and occupied the farm in question for 40 years preceding her death.

She had been a widow for approximately 25 years. Her oldest son, Albert, left home previous to her husband's death and had lived in Denver, Colorado, for over 40 years preceding her death. The youngest son died about 2–1/2 months after her husband's death, and from that time on she and her son George (plaintiff) lived together on the farm.

Defendants, who are children of Albert and grandchildren of deceased, endeavored to take by virtue of a will dated May 19, 1950, devising to them the farm after a life estate to plaintiff.

At the time of his father's death, plaintiff was in his thirties, and at the time of the trial he was 58 years of age.

Plaintiff claims that immediately after the death of his father in 1931, his mother requested him to continue to live with her upon the premises and to operate the farm for the remainder of her lifetime upon a share arrangement; that if he would enter into such an undertaking she would at the time of her death give the premises to him in fee simple; that he did enter into such an undertaking and did remain on the farm and operated same during the remainder of his mother's life.

It is conceded that after the death of plaintiff's father and brother, plaintiff remained on the farm and operated it in a good husbandlike manner; that he provided transportation for his mother, driving her every place she wanted to go; that he bought the

groceries and ran her errands and helped do the housework.

In appellants' brief we find the following statement:

"Plaintiff attempted to support his claim by 10 witnesses, 9 of whom were friends and neighbors of long standing.   *   *   *

"In considering the testimony of Otto Stelter, and the weight to be given it, this Court should keep in mind that the proofs also show that Tillie's other son, Albert, and her grandchildren, children of Albert, have long since left this part of the country as a result of which Uncle Otto and neighbors and friends of George have little or no interest in them but are interested only in their friend George."

There is nothing in the record to sustain the insinuation that plaintiff's 10 witnesses were motivated by any desire other than to tell the truth as they testified.

In this opinion we will outline the testimony of Otto Stelter and then will refer briefly to the testimony of the other 9 witnesses.

Otto Stelter was deceased's brother.  He testified that about a month after the death of his brother-in-law, he talked with his sister and she told him that, if George stayed with her and ran the farm until she died, she would give him the whole farm; that it was agreed everything was to be 50-50 between them in regard to expenses and profits from the farm; that she told him on repeated occasions that the farm was George's if he stayed with her as long as she lived; and that his sister never told him anything about having made a will.

The 9 witnesses appellants described as "friends and neighbors" of deceased and of plaintiff, testified as follows:

Witness number 1 stated that on Christmas day, 1955, which would be approximately 5 years after the

will in question was executed, he told deceased "she sure was one lucky lady to have a boy like George to take care of her and her property the way he was doing it," and "she says, 'Why shouldn't he? It's his, isn't it?'" Witness also commented in regards a conversation with deceased in the spring of 1954, as follows: "I told her I'd like to buy the 20 acres * * * she said 'No, not as long as I'm living. I want it kept as a farm. When I die George can do with it what he wants to.'"

Witness number 2 testified that in June, 1950, deceased told her: "'Well, I have given it all to George, the whole farm'"; also, that in 1945 deceased had stated: "'George better keep everything planted up because when I die it's all his.'"

The third witness' home was across the road a short distance from deceased's property. He testified that on numerous occasions deceased told him George was doing a good job taking care of the farm and that after her death the farm was to be his.

Witness number 4 moved out in close proximity to deceased's property in 1950. She testified that she had several neighborly visits with deceased; that she and her husband sold a couple of lots and started building homes, and deceased said: "'I wish George would do the same thing; sell a lot now and then, then he'd always have money on hand, without working so hard on the farm.' * * * She says he (George) could have done it any time, and I says, 'Well, as long as he likes to farm * * * let him farm, and when he gets old and can't work any more he can take and sell a lot now and then, and that way he will always have money.' And she says, 'Yes, that's a good idea. If he keeps the homestead and farm, he can sell it all the way across the way.' That's the way she said, 'Across the road, he can sell that. * * * After I'm gone the farm belongs to

George. After I'm gone if he wants to sell the land; whatever he wants to do.'"

Witness number 5 also moved into the neighborhood where deceased lived in 1950. He described numerous visits between his home and deceased's home, and testified:

"*Q.* Did you, during those visits, have an opportunity to talk, or (have) conversation with Mrs. Reinhardt about different things?

"*A.* Well, we discussed sometimes about the family kids, see. I got 3 boys and she knows that I help them out—my kids, and sometimes she said something about hers, too.

"*Q.* George?

"*A.* About George. Of course I didn't ask them anything because it was none of my business, but she always said—Well, you know. Lots of times she says, 'I don't see why George wants to work so hard, for he's got everything here. Why doesn't he take it easy?' * * *

"*Q.* During those conversations that you had with her did she at any time say anything in reference to George and the farm?

"*A.* Well, the only thing I remember, she says after she's gone everything belongs to George—the farm.

"*Q.* She told you that?

"*A.* Yes, everything was to go to George; the farm, tools and everything belonged to George.

"*Q.* Now, was there more than 1 conversation where she said that?

"*A.* Well, it was—she said that a few times at her home, and sometimes at my home when she'd visit with my wife and I happened to be there, too, and I heard that.

"*Q.* Now, when you were present at these conversations with Tillie did she ever say anything in reference to the fact that George would just have the farm for his lifetime, or that after George died the farm would go to somebody else?

"*A.* Never mentioned anything like that.

"*Q.* Did she ever say anything in reference to the fact that George should have just a life lease in the farm?

"*A.* She never mentioned anything about that."

Witness number 6 stated that her home was cater-cornered across the street from deceased's home and described numerous visits between herself and deceased. She stated that in the fall of 1954 deceased asked her if she could drive her into town, which she did; that she went with her to the bank and heard her tell the bank clerk that she would "like to have George's name taken off my account and put Albert's name on it"; that on the way home deceased said "she wanted to have that money in Albert's name. She says, 'George gets the farm so I think Albert should have this money.'"

The property of witness number 7 adjoined that of deceased and her home was just around the corner and across the street from deceased's home. She stated that she had known deceased since she was a little girl and that she had lived across the road from deceased since 1949; that during these years she had had many visits with deceased, and testified:

"Well, Mrs. Reinhardt had always talked about the farm and George to me since I can remember, but in the later years, as I grew older and got to understand property and the value of it, why she'd talk to me about it practically every time I saw her. * * *

"She always told me that George was a very good worker, and that—on one occasion, and I don't recall just when it was, as to the month or year, she told me at that time that George was going to have the property, that the property was George's. We had spoken of different things, and she says, 'Now the property is George's, and you will always have George for a neighbor', and that she would—that after her death 'George always would have my prop-

erty and my grandchildren will have what money I, have.' * * *

"*Q*. Now, in any of these talks that you had with her did she ever make reference to the fact that George was to have a life lease or a life estate, or that he was to have it just for his life, and then afterwards it was to belong to somebody else?

"*A*. No."

Witness number 8 moved onto property adjacent to deceased's farm in 1949 and related numerous visits deceased had with her at her house and she had had with deceased at deceased's home. Witness related the following conversation which took place in 1956, shortly before deceased died—between the time she returned from her first stay at the hospital and the last time she went to the hospital:

"Well, I don't know how it started, but we just got to talking and she says, 'You know, I am not too well any more,' and I said, 'Yes, I know you're not.' I said, 'Have you everything fixed like you'd like it when you go?' and she said, 'Yes,' and she says, 'George gets the farm.' * * *

"She says because he'd always stayed there and taken care of her, and she thought that George deserved it. * * *

"We talked a lot. I was over to her house so many times. We talked of many things, and she often would bring up about George working so hard on the farm, and it was always going to be his."

She was asked the following questions:

"*Q*. Now, on any occasion had she ever said or made reference to the fact that George was just to get the life lease in the farm?

"*A*. No.

"*Q*. Or that he was just to have the farm for his lifetime and then after his death it was to go to somebody else?

"*A*. No."

Plaintiff also called as a witness, Joseph Collier, municipal judge in St. Joseph, Michigan, and a licensed attorney, who drew the will in 1950. He testified that the will was not executed in his office; that deceased requested that he prepare the will and send it to an address other than her own. He was asked the following question to prove that deceased did not want plaintiff to know about the drawing of the will:

"*Q.* And at the time she was in your office giving you the information regarding the will, was there a conversation as to why the will should be mailed to the residence of a neighbor?

"*A.* According to my recollection she did not want her son George to know that the will was prepared."

In addition to the testimony of plaintiff, called for cross examination under the statute,* the defense consisted of the testimony of 3 witnesses, namely: Louise Klukas, a sister of deceased, Mrs. Klukas' daughter, Aileen Nimtz, and Albert Reinhardt, son of deceased and father of the 2 beneficiaries under the will.

The testimony of Louise Klukas and her daughter can be disposed of by saying that they merely testified that occasionally they visited deceased, and at no time did she discuss with them the disposition of her property and at no time made any reference to the fact that she had made a contract or agreement with plaintiff George Reinhardt.

Plaintiff's brother, Albert, testified that he was 64 years of age; that he left his mother's home in 1916 when he was 23 years old; that since that time he had lived in Denver, Colorado, but had occasionally come back to his mother's home to visit her; that in 1938 he talked to his mother about making a will, asking her whether she had made one but he

---

* See CL 1948, § 617.66 (Stat Ann § 27.915).—REPORTER.

did not discuss in any way how she should dispose of her property; that in 1951 Mrs. Klukas sent to him by mail the will of deceased and after receiving same he visited his mother, but that there was no discussion between them in regard to the contents of the will; that he received another copy of the will in 1955 but doesn't remember whether it was delivered to him or mailed to him, but claimed that his mother said she wanted him "to keep the will and be certain that it was produced on her death;" that he knew what the contents of the will were but did not discuss same with her; that she told him to keep the will secret. Further, that when he returned to the funeral, and before the funeral, he told George he had the will; that George knew nothing about a will up to that time, and he read the will to George; that George "got awful angry and said, 'You don't think I'm going to stand for that, do you? * * * Let me have the will. We'll burn it and you and I will settle this thing;'" that he refused, and the day after the funeral he turned the will over to Mr. Lange and asked him to file it.

The sole question presented is one of fact. The record sustains the finding of Hon. Philip A. Hadsell, Berrien county circuit judge, that a contract existed between plaintiff and his mother which was fulfilled by plaintiff and that plaintiff was entitled to specific performance.

Affirmed. Costs to appellee.

DETHMERS, C. J., and CARR, SMITH, BLACK, EDWARDS, VOELKER, and KAVANAGH, JJ., concurred.